**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10365

_____

THE HURRY FAMILY REVOCABLE TRUST,

SCOTTSDALE CAPITAL ADVISORS CORPORATION,

ALPINE SECURITIES CORPORATION,

*Plaintiffs-Counter Defendants-Appellees*

*Cross Appellants,*

*versus*

CHRISTOPHER FRANKEL,

*Defendant-Counter Claimant-Appellant*

*Cross Appellee.*

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:18-cv-02869-CEH-CPT

_____

Before JILL PRYOR, GRANT, and MARCUS, Circuit Judges.

GRANT, Circuit Judge:

Christopher Frankel's tenure as CEO of Alpine Securities Corporation ended in July 2018, but he did not leave empty-handed.  On his way out the door, Frankel forwarded to his personal email address a host of Alpine's sensitive documents—and then allegedly used them to negotiate with Alpine's competitors.

Word travels fast, and it wasn't long before Frankel found himself embroiled in a lawsuit brought by Alpine and two related entities, Scottsdale Capital Advisors Corporation and the Hurry Family Revocable Trust.  Years of motion practice, contentious discovery, and trial delays ensued, but the case eventually proceeded to trial in April 2021.  The jury found that Frankel breached his nondisclosure agreements, misappropriated Alpine's trade secrets, and unjustly enriched himself by over $900,000.  Frankel now appeals.  He challenges the sufficiency of the evidence supporting the jury's unjust enrichment award, as well as the district court's decisions to exclude a defense witness and to allow Alpine to argue that Frankel had been unjustly enriched.  Alpine, for its part, cross-appeals the district court's denial of its request for a permanent injunction.  We affirm on all fronts.

## I.

We begin by introducing the parties and describing the events that culminated in this lawsuit.  We then turn to the many months the parties spent in pretrial proceedings.  We close by discussing the trial, the jury's verdict, the parties' posttrial motions, and this appeal.

## A.

Alpine Securities and Scottsdale Capital are two companies involved in the broker-dealer business. They specialize in the buying and selling of over-the-counter stocks—stocks for smaller companies that are not listed on a formal exchange. Although their capabilities differ slightly, Alpine and Scottsdale were previously indirectly controlled by a common owner: the Hurry Family Revocable Trust.

Christopher Frankel joined Alpine as CEO in July 2015. As relevant here, Frankel signed two nondisclosure agreements: one during the negotiation process to become CEO, and one after those negotiations bore fruit. The latter NDA required Frankel to maintain trade secrets and other sensitive information "in the strictest confidence." Any documents that were related to Alpine's "business, projects, operations, activities or affairs," were for his eyes—and his eyes only.[1] He could not send that information to outside email accounts or use it to benefit anyone but Alpine. Nor could he take that information when the day came for him to leave the company.

That day came three years later. Frankel served as CEO until July 2018, but he stayed on as a consultant until October. He

---

[1] The NDA also prohibited Frankel from disclosing Scottsdale's confidential information to outside sources. Because the relationship between Alpine, Scottsdale, and the Hurry Family Revocable Trust does not matter for purposes of this appeal, we follow the parties lead and refer to these entities collectively as "Alpine" throughout.

used that wind-down time to gather copies of certain documents that belonged to Alpine and ensure his continued access to them once he left.  In his final days as CEO, for example, Frankel sent an email to his personal account attaching a  list of Alpine's top 50 accounts with year-to-date commissions.  That email was followed by several more, which together included "hundreds of pages of Alpine's business documents."   And around that same time, Frankel asked an Alpine employee for—and received—a "trade blotter," a detailed log that provides a snapshot of all the trades Alpine handled over a two-day period.

Armed with that information, Frankel began negotiating to buy his own broker-dealer.  But word quickly reached Alpine that he had been using its confidential information to do so.  The company sent Frankel a cease-and-desist letter, telling him that he was in breach of his NDA and demanding an immediate return of all documents that contained confidential information.  Frankel denied all wrongdoing, noting that he took "great exception" to Alpine's allegations.  Rather than take him at his word, Alpine moved the back-and-forth to a more formal setting—federal court.

Alpine, Scottsdale, and the Hurry Family Trust sued Frankel on November 21, 2018, claiming that he "knowingly and willfully used" Alpine's confidential information to help him "make a bid" to acquire his own broker-dealer and to solicit Alpine's top-dollar clients.  The complaint alleges that Frankel was in breach of contract (the NDAs) and that he misappropriated trade secrets in violation of the federal Defend Trade Secrets Act and the Florida

Uniform Trade Secrets Act.  *See* 18 U.S.C. § 1836(b); Fla. Stat. ch. 688.  Alpine sought, among other things, actual damages and an award for unjust enrichment.  After the district court rejected Frankel's efforts to dismiss the case for failure to state a claim, the parties proceeded to discovery.

## B.

Discovery was adversarial—to put it mildly.  When the parties exchanged initial disclosures, Alpine listed certain categories of damages that it intended to seek at trial—including unjust enrichment—but it did not provide a computation of damages or explain how it planned to establish them.  It instead noted that the damages were "unknown at this time" and would "require expert analysis and testimony."  And Frankel's initial disclosures listed only two people who were likely to have discoverable information: himself and his attorney.

The parties also exchanged initial interrogatory responses, in which Frankel identified Alpine's current or former clients that he had been in contact with since August 2018.  That list included John Fife from Chicago Venture Partners.  (Fife will prove important later.)  Frankel also produced over 2,000 pages of documents, which he claimed covered "all documents that contain information about" Alpine in his possession.

So far, so good.  But as discovery continued, Alpine raised concerns that Frankel was not fully complying with Alpine's requests for production.  The parties engaged in a few court-ordered meet-and-confers, but neither side left satisfied: Alpine felt

that it was being slighted, while Frankel stressed that he had turned everything over.  Then, a few months into discovery, Alpine learned that Frankel had accepted a job at a competitor broker-dealer called Vision Financial Markets, LLC.

That prompted Alpine to send Frankel a second set of requests for production, this time seeking documents that showed his sources of income since he left Alpine (but noting that he could redact documents "for account numbers, social security numbers, and monetary amounts").  It also filed a notice of intent to serve subpoenas on several third parties, including Vision.  Frankel responded with a copy of his contract with Vision, which redacted his monthly compensation, his monthly profit share from the group he headed (the Corporate Services Group), and the formula used to determine that profit share.

The discovery deadline came and went in August 2019, but Alpine was still not happy.  Four months later, it filed a motion to compel and request for sanctions against Frankel for intentionally "stonewalling" its requests for relevant documents.  According to Alpine, third-party discovery revealed emails from Frankel that he should have included in his initial disclosures.  After a hearing, the district court denied the motion to compel.  Not only had Alpine known about this discrepancy for months, the court said, but Frankel had "persuasively argued" that his failure to produce those emails was inadvertent.

As the February 2020 trial date approached, the parties identified potential witnesses and the issues to be tried in a joint

pretrial statement—but noted that they "failed to reach agreement" on the statement and only filed it "to comply with the Court's order." Alpine stated that it planned to show at trial that Frankel breached his NDAs and misappropriated Alpine's trade secrets, and that he was unjustly enriched by doing so. Frankel countered that Alpine could not proceed on that theory at trial because it "did not adduce or disclose damages evidence" during discovery. Additionally, Frankel identified over twenty persons that he might call as witnesses, including Fife—despite having identified only two witnesses (including himself) in his initial disclosures. But before these details could get hammered out, the district court continued the trial to March 2020.

Days before the new trial date, Alpine filed yet another motion to compel—this time, not only seeking sanctions against Frankel, but also asking the court to push the trial date and reopen discovery. Alpine alleged that evidence had recently surfaced from Vision's third-party production suggesting that Frankel had "actively tried to thwart" discovery and failed to produce relevant documents in his possession.[2] The court, "troubled" by the

---

[2] Alpine had been trying to obtain discovery from Vision since June 2019, when it served the company a third-party subpoena. Frankel filed a motion to quash, and in response, Alpine agreed to limit the scope of the subpoena. But as the discovery deadline approached, Vision told Alpine that it "did not plan on producing the requested documents." So Alpine filed a motion to compel, first in Connecticut (where Vision is headquartered) and then in New York, before the parties had stipulated to transfer the matter back to Florida. Alpine finally obtained an order compelling Vision to comply with its subpoena in January 2020.

allegations, agreed to reschedule the trial for May 2020 and to order a limited reopening of discovery.  It did not award sanctions.

Considering that this was spring of 2020, one may suspect what happened next: the COVID pandemic pushed the trial even further.  That gave the parties more time to dispute what had happened in discovery.  The court held a (virtual) hearing on Frankel's motion in limine to preclude Alpine from presenting evidence that it sustained damages, because it had disclosed no evidence of damages in discovery.  Alpine opposed on the ground that it could not have provided a calculation earlier because Frankel had been "stonewalling" Alpine's efforts to obtain "evidence of those damages."  The court determined that the documents that had been produced could come in—but "anything else with respect to damages" that had not been produced could not.

Trial was set for April 2021.  Before that date, the parties endeavored to straighten two issues out: what witnesses they planned to call and how Alpine could prove its damages.  First, Frankel asked Alpine for its "real witness list" about a week before trial and offered them his.  Only four people were on Frankel's

---

Vision complied with that order, and its responses prompted Alpine to file this motion to reopen discovery.  Alpine alleged that Vision's production revealed more emails that Frankel "did not produce or disclose" during discovery. Those emails, according to Alpine, showed that Frankel "actively tried to thwart" discovery.  For example, Frankel told Vision to tell Alpine to "buzz off" and to "[m]ake them come to CT and get an order" to compel third-party production.

"real" list, himself and three others—not Fife. And the day before trial, Frankel again pressed the damages issue, urging the court to prohibit Alpine from presenting its damages theory because it had not previously disclosed a calculation. He also argued that allowing Alpine to question him about his compensation with Vision during trial would give it a "back-door in[to] a new and undisclosed damages computation." The district court agreed that Alpine "did not previously disclose a numerical computation of damages," so it could not "elaborate on a specific dollar amount" at trial. But it also said that Alpine could question Frankel about the "commissions and/or bonuses" he received "from former clients of [Alpine] who switched to Vision."

## C.

That brings us to trial. Alpine presented evidence over several days showing that Frankel forwarded confidential information to his personal email address. The information included a list of Alpine's top 50 clients, a trade blotter, financial statements, a draft employment agreement, and other sensitive documents. The client list revealed that Fife owned three of Alpine's top clients—Chicago Venture Partners, Iliad Research, and St. George Investments (the Fife Entities). It also told Frankel how much money each of those clients brought in.

Frankel estimated that around thirteen of Alpine's clients— including all three Fife Entities—opened accounts with Vision after he started working there. In one email exchange, Frankel told Chicago Venture that Vision offered better rates than what it had

been paying at Alpine, and noted that he was "well aware" that the firm would be Vision's "biggest and highest quality client."  He emphasized to the Chicago Venture representatives that their business was "important" to him because he wanted to "make a good first impression with Vision."

Frankel also testified that the Fife Entities were serviced by Vision's Corporate Services Group, which he headed.  He confirmed that the commissions from the Fife Entities went into the Corporate Services "bucket," from which he got "a share of the profits."  While he did not know what percentage of that share came from the Fife Entities, he testified—over an objection—that the entities generated "at least" $100,000 per month in commissions for Vision.  He also recalled that, during the six-month period after he started working for Vision, his profit share amounted to approximately $264,000.

Alpine rested its case on the fourth day of trial.  The court expected Frankel to rest that day too, believing that he planned to call only one witness—himself—to the stand.  But after the midday recess, Frankel asked the court if he could bring in Fife to testify the next day.  Alpine, surprised, vigorously objected, arguing that Fife's name had been absent on Frankel's short list of "real" witnesses that the parties had exchanged the week before.  Frankel replied that he left Fife off his witness list because he did not expect Alpine's damages theory to be centered around the Fife Entities.  The district court sustained Alpine's objection and excluded Fife, but allowed Frankel to proffer Fife's testimony for the record.

Fife's declaration states that although his companies still maintained accounts at Alpine, he was told that Alpine lacked the capital to support all the trades that his companies would like to clear.  And he added that he was the one who sought Frankel out to open accounts at Vision, not the other way around.

Ahead of closing arguments, Alpine asked the court to clarify whether it would be allowed to "elaborate on the numbers that Mr. Frankel testified to," keeping in mind the court's earlier order barring it from presenting "any numerical computation of damages" because it had not disclosed a damages computation. The court had "no problem" with Alpine discussing Frankel's testimony, but said that Alpine would veer into new-damages-computation territory if it said "that the plaintiffs' damages are X amount" in unjust enrichment and lost profits if that hadn't "come out in testimony."

Alpine came to court for closing arguments the next day with a demonstrative aid in hand.  The demonstrative displayed the categories of damages that Alpine sought and how the jury might go about finding them.  Frankel objected on the ground that the demonstrative constituted an undisclosed damages computation, but Alpine insisted that it was just "math based on [Frankel's] testimony."  The court allowed it, agreeing that it simply allowed the jury to "follow the math."

The jury retired for deliberations.  A few hours in, the jury asked the court for a copy of the "compensation chart" Alpine showed during closing arguments.  The court said no, explaining

that the chart "was just a demonstrative aid." Shortly after, the jury returned its verdict: Frankel breached his nondisclosure agreements and misappropriated trade secrets. And while it found that Frankel was unjustly enriched by $932,000 from the misappropriation, it also found that Alpine itself suffered no monetary harm from Frankel's actions, declining to award even nominal damages.

The parties were not done just yet. After trial, Alpine sought a permanent injunction against Frankel that, among other things, would bar him from misappropriating Alpine's trade secrets going forward. And Frankel moved for judgment as a matter of law based on insufficient evidence to support the unjust enrichment award. He also sought a new trial so that he could present Fife's testimony to rebut Alpine's "unpled, undisclosed, damage claims." The district court denied all three motions.

Both parties appealed. Frankel challenges the denial of his posttrial motions for judgment as a matter of law and for a new trial, and Alpine challenges the denial of a permanent injunction.

## II.

We start with Frankel's motion for a new trial, which we review for abuse of discretion. *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1255 (11th Cir. 2016). That deferential standard is especially fitting where, as here, a new trial has been denied and the jury's verdict is left intact. *See id.*

Frankel argues that he is entitled to a new trial because the district court abused its discretion in two ways—*first*, by preventing

him from calling Fife as a defense witness, and *second*, by allowing Alpine to present its theory that Frankel was unjustly enriched and to use a demonstrative related to that theory.  Neither argument persuades us.[3]

### A.

"Given the caseload of most district courts and the fact that cases can sometimes stretch out over years, district courts must have discretion and authority to ensure that their cases move to a reasonably timely and orderly conclusion."  *Chrysler Int'l Corp. v. Chemaly*, 280 F.3d 1358, 1360 (11th Cir. 2002).  District courts thus have "broad discretion" to resolve pretrial discovery disputes and scheduling matters, as well as to manage trials.  *Perez v. Miami-Dade County*, 297 F.3d 1255, 1263 (11th Cir. 2002); *United States v. Hilliard*, 752 F.2d 578, 582 (11th Cir. 1985).  That's not to say that district courts' discretion to make case-management decisions is "unfettered"—but "it is and must be broad."  *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367 (11th Cir. 1997); *Chrysler Int'l Corp.*, 280 F.3d at 1360.  We typically will not overturn a district court's exercise of this discretion unless it represents a "clear error of judgment" or a "misapplication of law."  *Henderson v. Ford Motor Co.*, 72 F.4th 1237, 1243 (11th Cir. 2023).

---

[3] Alpine argues that we should affirm because Frankel's motion for a new trial was facially insufficient.  But because the district court went on to reach the motion's merits, which have now been extensively briefed on appeal, we need not consider that argument.

14                          Opinion of the Court                    23-10365

The district court's decision to exclude Fife was a valid exercise of this trial-management discretion.[4] The last time Alpine (or the court) had heard that he may be called as a witness was more than a year before—in 2020, when Frankel listed nearly two dozen new witnesses in a pretrial statement for a trial that did not happen (and that itself disclaimed any agreement between the parties about the contents of the statement). Once the trial really did happen, and was set to last for five days, Frankel did not float the idea of calling Fife until after the jury was excused for its lunch break on the fourth day. Why not earlier? He knew from the pretrial discussions that Alpine had a green light to ask him about the commissions he received from former Alpine clients. And when Alpine called Frankel to the stand on day two, it questioned him along those exact lines. It elicited testimony that the Fife Entities were some of Alpine's biggest clients, that they opened accounts with Vision after Frankel started working there, and that their commissions were funneled into his group's profits. So he had known since day two (at least) that the Fife Entities were important to Alpine's case—yet he waited two more days to bring up Fife, suggesting he could testify the next morning (on day five).

---

[4] Frankel advocates for de novo review, arguing that the district court's decision to exclude Fife rested on a misinterpretation of Federal Rule of Civil Procedure 26. *See Circuitronix, LLC v. Kinwong Elec. (Hong Kong) Co., Ltd.*, 993 F.3d 1299, 1303 (11th Cir. 2021). But as we see it, the district court's ruling primarily rested on an exercise of its "considerable discretion in determining whether exclusion is proper," so the abuse of discretion standard applies. *Henderson*, 72 F.4th at 1243.

But by then, trial was winding down. As noted, the court expected the parties to wrap up on day four and kick off day five with closing arguments. Frankel's request simply came too late in the game.

What's more, Fife was not disclosed on Frankel's "real" witness list before trial. The court asked for clarification about whether the parties had "a, quote, unquote, gentlemen's agreement that [Frankel was] not going to call him, or he was not on [Frankel's] short list." Alpine confirmed that he was not included on Frankel's "real" witness list. This colloquy followed:

> The Court: Let me ask it this way. Was he disclosed in the initial disclosures or supplemental disclosures . . . ?
>
> Alpine: No . . . .
>
> The Court: Okay. So why did you not move to exclude him as a witness when you moved to exclude [another witness]?
>
> Alpine: Because they didn't tell me they were going to call him. They gave me a short list. It wasn't a gentlemen's agreement . . . . [H]e told me here is who I'm calling at trial, I told him here is who I'm calling. Fife wasn't on that list. If he had been, I would have brought it up then. This just happened.

16                     Opinion of the Court                  23-10365

> Frankel:    And here is the problem, Your Honor. You know, the case during trial morphed into a damage calculation that had never been provided to us based on funds owned by Mr. Fife . . . .  And remember, I didn't supplement any disclosures, but I certainly put him on the witness list . . . .
>
> The Court:  I don't think he should be allowed to testify . . . all right?   He should be excluded . . . .   He's going to be excluded, that's my ruling.

What does this discussion reveal?  That the district court was primarily concerned that Fife was not included on the short list Frankel gave Alpine before trial, and even before that, Frankel had never made it clear that he would call Fife.  Frankel pointed out that he had named Fife as a potential witness on a joint pretrial statement the parties submitted before the trial was delayed.  What he did not emphasize is that he had also named more than twenty others—none of whom had been identified as witnesses during discovery, much less deposed.  And in any event, the court pushed the trial before the parties had a chance to pin down the witnesses that Frankel could and would call.  For its part, Alpine suggested that the parties could use the trial delays to depose each other's witnesses.  Frankel refused.  To summarize: Frankel had put Fife on a disputed witness list before a trial that never happened,

refused to allow him to be deposed, failed to include him on the witness list that he provided before the trial that did happen, failed to call him after Alpine's damages theory became clear, and then tried to call him after the court understood that almost all of the witness testimony had been completed. *Cf. Com. Union Ins. Co. v. M/V Bill Andrews*, 624 F.2d 643, 648 (5th Cir. 1980) (holding that the district court did not abuse its discretion in excluding a witness based on the parties' pretrial agreement that the witness would neither be deposed nor called to testify).[5]

At that point, the court entertained arguments from the parties. After listening to Frankel's argument on the one hand that Alpine's damages theory came as a surprise, and Alpine's contention on the other that it would suffer "[m]assive prejudice" if Frankel were allowed to call Fife at such a late stage of the trial, the court determined that Fife's testimony could not come in. Considered in context, that choice was a reasonable one. *See Fabrica Italiana Lavorazione Materie Organiche, S.A.S. v. Kaiser Aluminum & Chem. Corp.*, 684 F.2d 776, 780–81 (11th Cir. 1982).

Frankel spills much ink arguing that he did not need to supplement his Rule 26 disclosures to add Fife, but that's largely beside the point. To be sure, the district court alluded to Rule 26 when it was deciding to exclude Fife's testimony. But the discussion about whether to allow Fife to testify did not stop

---

[5] This Court has adopted as binding precedent all decisions of the Fifth Circuit issued before October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

18                     Opinion of the Court                     23-10365

there—the court went on to ask Alpine why it had not moved to exclude Fife earlier.   (The answer: because Fife was not on Frankel's "real" witness list.) Setting Rule 26 aside, Frankel still had not put Fife on his short list, and waited until the last minute to call him.  With this full context in mind—the district court's familiarity with this case due to the lengthy pretrial proceedings, the late stage at which Frankel asked to call Fife, and Fife's absence from Frankel's short list—we conclude that the district court did not abuse its discretion in preventing Frankel from calling Fife to the stand.

## B.

Frankel next argues that the district court should not have allowed Alpine to argue that Frankel was unjustly enriched.  He starts broadly, contending that Alpine ambushed him with its unjust enrichment theory at trial rather than disclosing its damage calculation and methodology sooner.  But the record belies that assertion: Alpine alleged that Frankel was unjustly enriched from the very beginning, in both its complaint and its initial disclosures.  After Frankel joined Vision, Alpine pushed for discovery "relevant to unjust enrichment damages"—namely, the commissions that he received from the clients who followed him to Vision.  Alpine explained its theory this way: "He moved the clients.  He broke the law doing it, and we get the money he made off of it."  Alpine also argued again and again during the pretrial proceedings that it could not provide a damages calculation because Frankel was impeding its efforts to obtain the relevant numbers.  Contrary to what

Frankel says, the record reveals many times when Alpine clearly expressed its intent to pursue an unjust enrichment theory at trial.

Having no luck there, Frankel turns to a narrower argument: that the district court should have barred Alpine from using its demonstrative aid during closing arguments. This argument fails too, as the district court reasonably found that the chart was solely based on Frankel's trial testimony and just helped the jury to "follow the math."

But wait, Frankel says: the district court's own prior ruling precluded Alpine from "elaborat[ing] on a specific dollar amount" because it "did not previously disclose a numerical computation of damages." That's true. But it's also not the end of the story. The court also said that Alpine could question Frankel about the "commissions and/or bonuses" he received from former Alpine clients who switched to Vision. And at trial, Frankel's testimony revealed that many of Alpine's former clients had opened accounts with Vision after Frankel started working there—and that he received a cut of the profits. So when it came time for closing arguments, Alpine asked the court if it could "elaborate on the numbers that Mr. Frankel testified to" in closing. The court—aware of its prior ruling—said that it had "no problem" with Alpine discussing Frankel's testimony. It would become an issue only if Alpine told the jury "that the plaintiffs' damages are X amount and they include a certain amount in unjust enrichment damages," as that might "very well be a new damage computation that you didn't disclose, *if that doesn't come out in testimony*."

The district court had a range of choices for how it could have handled this situation—and its decision fell comfortably within that range. *Henderson*, 72 F.4th at 1242. Alpine's demonstrative aid helped the jury calculate its damages based on the numbers that *came out in testimony*. Though Frankel objected that the chart constituted an undisclosed damages computation, the court agreed with Alpine's argument that the demonstrative aid was grounded in Frankel's testimony and merely allowed the jury to "follow the math."[6] Frankel is not entitled to a new trial.

### III.

Frankel also appeals from the denial of his motion for judgment as a matter of law, arguing that Alpine failed to present sufficient evidence to support the jury's unjust enrichment award. We review that decision de novo, examining the trial evidence in the light most favorable to Alpine as the non-moving party. *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 902 (11th Cir. 2004). Judgment as a matter of law is warranted when "there is no legally sufficient

---

[6] We think Rule 37 also lends support here, although the district court did not explicitly base its ruling on it (or any other rule). Rule 26, which governs initial disclosures, requires a party to include a "computation of each category of damages claimed" and to supplement those disclosures if they are "incomplete or incorrect." Fed. R. Civ. P. 26(a)(1)(A)(iii), (e)(1)(A). If a party fails to provide that information, Rule 37 allows for exclusion "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Alpine's failure to supplement its initial disclosures was likely substantially justified because it did not have numbers to calculate damages until Frankel testified at trial—numbers that Frankel had in his possession all along but chose not to disclose until he was on the stand.

evidentiary basis for a reasonable jury" to return a verdict in the non-moving party's favor. *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quotation omitted); *see* Fed. R. Civ. P. 50(a)(1).

Both federal and state law allow plaintiffs to recover for unjust enrichment, which measures "the value of the secret to the defendant." *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 536 (5th Cir. 1974); *see* Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(B)(i)(II); Uniform Trade Secrets Act, Fla. Stat. § 688.004(1). In other words, unjust enrichment damages strip defendants of the "benefits, profits, or advantages" they gained "in the use of the trade secret." *Univ. Computing Co.*, 504 F.2d at 536 (quotation omitted). The standard for calculating unjust enrichment in misappropriation cases is "very flexible." *Id.* at 535; *cf. Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 809 (2d Cir. 2023). All that's typically needed is a "reasonable basis from which the amount can be inferred or approximated." *Premier Lab Supply, Inc. v. Chemplex Indus., Inc.*, 94 So. 3d 640, 644 (Fla. Dist. Ct. App. 2012) (quotation omitted).

Frankel asks us to set aside the jury's $932,000 unjust enrichment award, claiming that the record lacks proof that he gained anything by using Alpine's trade secrets. But here again, the record tells a different story.

The jury returned a general verdict, which means that Alpine need only show that Frankel misappropriated at least one trade secret. *Fin. Info. Techs., LLC v. iControl Sys., USA, LLC*, 21 F.4th

1267, 1272 (11th Cir. 2021).  Frankel does not dispute that he took Alpine's customer list and revenue information when he left the company—instead, he argues that the jury cannot be sure that he subsequently gained an advantage from his use of those documents.  That's not so.

Alpine presented evidence that Frankel touted his ability to secure better rates for Chicago Venture (Alpine's highest-paying client) at Vision, comparing the proposed rates to what Chicago Venture had been paying at Alpine.  In that same email exchange, Frankel acknowledged that Chicago Venture would become Vision's "biggest" client, and that securing its business would help him "make a good first impression with Vision."  Chicago Venture and the other Fife Entities then opened accounts with Vision, bringing hundreds of thousands of dollars with them—a portion of which went right into Frankel's pocket.  So while Frankel protests that the award "did not reflect anything" he gained by using the trade secret, there was enough evidence for the jury to conclude otherwise.  And at this stage, "all evidence and inferences must be in the light most favorable to the prevailing party"—here, Alpine. *Crawford v. ITW Food Equip. Grp., LLC*, 977 F.3d 1331, 1342 (11th Cir. 2020).

The same is true for the amount.  Measuring damages for trade secret misappropriation is not a perfect science, and there are at least two ways in which this jury could have reasonably landed on its number.  *See Perdue Farms Inc. v. Hook*, 777 So. 2d 1047, 1051 (Fla. Dist. Ct. App. 2001).  First, Frankel testified that his profit

23-10365                Opinion of the Court                23

share was approximately $264,000 in his first six months with Vision.  Applying that figure to the 22 months that elapsed between July 2019 (his start with Vision) and April 2021 (the start of trial), Frankel's profit share would have exceeded the jury's $932,000 unjust enrichment award.  Alternatively, Frankel testified that the Fife Entities generated "at least" $100,000 per month in commissions for Vision.  The jury could have reasonably taken those numbers—multiplied by the margins Frankel testified to—to find that Fife Entities would have generated almost exactly $932,000 in net revenue.  In other words, the amounts the Fife Entities generated in commissions provided a reasonable basis from which the jury could approximate the value of the information Frankel took to his new employer.

Even if Alpine was not able "to prove specific injury" in the form of actual damages, the jury was entitled "to measure the value of the secret to the defendant" in calculating unjust enrichment. *Univ. Computing Co.*, 504 F.2d at 536.  That's especially true given that "damages need not be calculated by mathematical precision." *United States v. Killough*, 848 F.2d 1523, 1531 (11th Cir. 1988). Analyzing the full record—including the clients that joined Vision and paid into the group from which Frankel earned his bonus—the jury acted within its discretion when it arrived at the unjust enrichment award.

## IV.

That leaves Alpine's request for a permanent injunction. We review a district court's decision to grant or deny injunctive

relief for abuse of discretion, evaluating the factual findings for clear error and any legal conclusions de novo. *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1349 (11th Cir. 2009).

As the party seeking permanent injunctive relief, Alpine must demonstrate that it has succeeded on the merits. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006). Once it does so, the district court evaluates whether injunctive relief is warranted by considering whether: (1) the movant has suffered an irreparable injury; (2) the remedies at law are inadequate; (3) the balance of the hardships favors an equitable remedy; and (4) a permanent injunction would not disserve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The district court concluded that Alpine couldn't get past the first two factors— irreparable harm and inadequacy of the remedies at law—and thus denied Alpine's requested relief.[7]

Alpine first takes issue with the district court's irreparable-harm analysis, arguing that Frankel's continued possession and use of its trade secrets will inflict irreversible damage on its business. It rightly points out that we have found that the loss of customers constitutes an irreparable injury. *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991). Even so, the district court was

---

[7] Among the six claimed trade secrets that Alpine sought to protect, the district court found that only one—its client list—met the requirements for a trade secret. Alpine challenges that conclusion on appeal, arguing that the district court clearly erred in finding that its trade blotter did not qualify as a trade secret. We need not reach that argument because, in any event, the district court did not abuse its discretion in declining to grant injunctive relief.

not convinced by Alpine's allegations that it would suffer irreparable harm absent an injunction. Why not? Because Alpine knew (or at least suspected) from the outset that Frankel had misappropriated its trade secrets—yet did not move for injunctive relief until more than a month after the jury returned its verdict. As a party's delay in seeking preliminary injunctive relief may "undermine a permanent injunction," the district court did not err in weighing that delay against Alpine here. *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1006 (9th Cir. 2023).

Alpine responds that it did not fully "grasp" the "extent of Frankel's misconduct" until well after the window of opportunity to seek preliminary relief closed. But the "very idea" of preliminary relief is to "protect a plaintiff's rights before a case can be resolved on its merits." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). And we, like the district court, are hard pressed to believe that Alpine—a well-resourced company with sophisticated counsel—did not understand the need for injunctive relief in the years the parties spent litigating this case. Alpine's counsel accused Frankel of taking and disclosing its confidential information before it even filed its complaint. And Alpine's owner testified that this "lawsuit started because [Alpine] had evidence that he was using confidential trade secret information to unfairly compete." On top of that, the asserted trade secrets were filed on the public docket along with all the other trial exhibits—yet Alpine never moved to seal them. Simply put, Alpine's delays cut against its posttrial allegations that it would suffer irreversible damage from Frankel's

continued use of its confidential information.  *See Redbubble*, 75 F.4th at 1006.

This is not to say that preliminary injunctive relief is a prerequisite for obtaining permanent injunctive relief—it's not. Here, though, the district court reasonably concluded that Alpine's failure to seek preliminary relief "militates against a finding of irreparable harm." *Wreal*, 840 F.3d at 1248.

There's also the no-adequate-remedy-at-law factor, which the district court weighed against Alpine, too.  Alpine says it has suffered harm from Frankel's misconduct and that it needs injunctive relief because "no amount of money" could make its information confidential again.  That may well be true.  But the district court declined to take the argument at face value—instead, it looked to the verdict form, which told the jury that it could award nominal damages if it determined that Frankel's conduct caused Alpine to suffer unquantifiable damages.  But the jury did not do so—in fact, it concluded that Alpine had suffered no monetary harm at all.  The district court credited that finding— which makes sense, as "all findings necessarily made by the jury" when resolving legal claims bind the trial court when it separately resolves the equitable claims. *Dybczak v. Tuskegee Inst.*, 737 F.2d 1524, 1527 (11th Cir. 1984) (quotation omitted); *see also BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1151 (11th Cir. 2007).

In response, Alpine argues that the district court overlooked the jury's unjust enrichment award, which could have "reasonably [been] based on a finding that Alpine was harmed."  But that's just

not right—unjust enrichment addresses "not what plaintiff lost, but rather the benefits" the defendant gained. *Univ. Computing Co.*, 504 F.2d at 536 (quotation omitted). All this considered, the district court rightly concluded that Alpine failed to show that it had no adequate legal remedy.

Because Alpine could not satisfy its burden of showing that it suffered an irreparable injury and that the remedies at law are inadequate, we need not engage with the remaining two factors. The district court did not abuse its discretion in declining Alpine's request to enter a permanent injunction in its favor. *eBay Inc.*, 547 U.S. at 391.

★    ★    ★

Opposing parties in our adversarial system do not always play nice—and this case is a prime example. When those differences manifest as hotly contested discovery disputes and evidentiary clashes, we give district courts wide latitude to resolve the conflicts. They are the ones in the room.

The district court here did not abuse its discretion by denying Frankel's motion for a new trial or err in denying his motion for judgment as a matter of law. Nor did it abuse its discretion when it denied Alpine's request for a permanent injunction. For those reasons, we **AFFIRM**.